**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MICHAEL B. TROEMEL**
Lafayette, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**KATHERINE MODISETT COOPER**
Deputy Attorney General
Indianapolis, Indiana

FILED
Apr 18 2012, 9:40 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| JASON MYERS, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 09A02-1105-CR-598 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE CASS SUPERIOR COURT
The Honorable Richard A. Maughmer, Judge
Cause No. 09D02-1007-FB-22

April 18, 2012

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Following a jury trial, Jason Myers appeals his convictions for battery resulting in serious bodily injury,[1] a Class C felony, and aggravated battery,[2] a Class B felony. He raises four issues that we restate as:

I.     Whether the trial court erred by denying Myers's motion alleging prosecutorial vindictiveness;

II.    Whether the trial court erred when it permitted the State to amend its charging information for aggravated battery;

III.   Whether the trial court abused its discretion when it excluded the testimony of Myers's proffered expert witness Brandon Sieg; and

IV.    Whether the State presented sufficient evidence to rebut Myers's claim of self-defense.

We affirm.

## FACTS AND PROCEDURAL HISTORY

On the evening of August 22, 2009, Myers was at the US 24 Speedway ("the Raceway") in Cass County, Indiana. Terry Wilson ("Wilson") also was at the Raceway, but not with Myers. Myers and Wilson shared the mutual interest of car racing and knew each other from having regularly seen each other at racing events for a number of years. Both men had sons who were involved in racing mini-midget cars. That night, Wilson's son, Trent, was participating in a race, in which Myers was also participating. At some point in the race, Trent was in second place, and Myers was the "lap car," at or near the back of the group of drivers. *Tr.* at 70. Myers's vehicle came into contact with the rear of Trent's vehicle,

---

[1] *See* Ind. Code § 35-42-2-1(a)(3).

[2] *See* Ind. Code § 35-42-2-1.5(2)

2

causing him to spin into the infield, and Trent was eliminated from the race. When the race concluded, Wilson left the stands, where he had been watching the race, in order to find and confront Myers about his driving. Wilson was angry and was yelling as he approached Myers. Somewhere along the way, Wilson's seventeen-year-old son, N.W., and his friend, W.L., saw Wilson walk past, and they followed him.

Wilson found Myers in a common area and confronted him, yelling and cursing at Myers about his driving in the race that caused Trent to spin out and be eliminated. Wilson either pushed or attempted to push Myers. Myers turned to walk away, and Wilson raised his arm toward Myers, who then grabbed Wilson's arm and forcefully threw him to the ground. Wilson got to his hands and knees, and Myers kicked Wilson in the head, on the side of the face, so that Wilson flipped over backward. Myers walked away. Wilson's son, N.W., and his friend, who had witnessed the altercation from approximately sixty or seventy feet away, came to assist Wilson and helped him back to his trailer, where Wilson discovered he had "a mouth full of teeth and blood." *Id*. at 75. A man who had observed the fight went to the track's owner to make him aware that "a pretty big incident" had occurred. *Id*. at 137. Wilson's wife transported him to the hospital. As a result of the incident with Myers, Wilson suffered injuries, including three or four broken teeth, three cracked ribs, a crushed cheekbone that required placement of a plate in Wilson's face, and an eye socket injury, which eventually required multiple surgeries to keep the eye correctly placed in its socket.

In September 2009, the State charged Myers with one count of Class A misdemeanor battery; however, in February 2010, the State dismissed the misdemeanor charge and re-filed

3

the charge as a Class C felony battery resulting in serious bodily injury. Thereafter, in July 2010, the State filed an additional count of Class B felony aggravated battery. In August 2010, Myers filed a motion to dismiss Count II, aggravated battery; the trial court did not grant the motion to dismiss, but rather ordered the State to amend Count II to provide more specificity as to the injured "bodily member or organ." *Appellant's App.* at 21. In response, the State filed in September 2010 an amended information that included one count of Class C felony battery resulting in serious bodily injury and four separate counts of Class B felony aggravated battery (one each for: broken facial bone, nasal and sinus damage, protracted visual impairment, and broken tooth).

On January 25, 2011, the first day of the scheduled jury trial, Myers filed a motion to dismiss counts III, IV, and V on double jeopardy grounds. Myers also filed a Notice of Defense of Prosecutorial Vindictiveness and requested a continuance of trial. The State did not object to a continuance, and trial was rescheduled to April 2011. On March 11, 2011, the State amended its five-count information, changing the cited statute for the four aggravated battery counts from Indiana Code section 35-42-2-1.5(1), which alleges "serious permanent impairment" to subsection 1.5(2), which alleges "protracted loss or impairment of the function of a bodily member or organ."

The trial court conducted a hearing on March 14, 2011 and denied Myers's motion to dismiss and Myers's claim of prosecutorial vindictiveness. The trial court also ordered that the State condense the four aggravated battery charges (Counts II, III, IV and V) into one count of aggravated battery. Accordingly, on March 15, the State amended its charges to

4

allege one count of Class C felony battery and one count of Class B felony aggravated battery.[3]

Myers consistently maintained that he acted in self-defense that night. During his case-in-chief, Myers sought to present the testimony of a martial arts expert, Brandon Sieg ("Sieg"), concerning the reasonableness of the force used by Myers in response to Wilson. The court conducted a hearing out of the jury's presence during which Myers made an offer of proof, having Sieg testify. The trial court determined that, although Sieg qualified as an expert witness under Indiana Evidence Rule 702, Sieg did not personally witness the altercation and his testimony would not assist the trier of fact, concluding that a juror could reach the same conclusion without the expert's testimony. *Tr.* at 340. The trial court excluded Sieg's proposed testimony.

Following the jury trial, Myers was found guilty of both counts. The trial court merged the Class C felony battery conviction with the Class B felony aggravated battery conviction, and it imposed an executed sentence of six years to be served on in-home detention. Myers now appeals.[4]

## DISCUSSION AND DECISION

### I. Prosecutorial Vindictiveness

---

[3] Two days before trial, the State re-filed the exact same two charges, but replacing a handwritten numeral two in Indiana Code section 35-42-2-1.5(2) with a typed numeral "2." *Appellant's App.* at 46, 51.

[4] We remind Myers that Indiana Appellate Rule 46(A)(6)(b) requires that the statement of facts in a party's brief shall be stated in accordance with the standard of review appropriate to the judgment being appealed. We caution Myers to be mindful in the future of this requirement.

5

A few months prior to trial, Myers filed a Notice of Defense of Prosecutorial Vindictiveness, in which he outlined his intention to present evidence to the jury to support his claim the State had engaged in vindictiveness. In particular, Myers intended to show the jury that the State "escalated the Defendant's jeopardy" on several occasions, namely when it dismissed the misdemeanor charge and re-filed it as a Class C felony battery, and thereafter added the Class B felony aggravated battery charge, which was then extended to four separate aggravated battery counts and eventually returned to one aggravated battery count. *Appellant's App*. at 30. The trial court conducted a hearing and denied Myers's motion to the extent it requested permission to present such evidence to the jury. On appeal, Myers claims the various amendments and re-filings "of increasing seriousness" were not because of new evidence, but rather were because Myers had maintained his innocence. *Appellant's Br*. at 13. He asserts that the trial court erred when it ruled against his intent to pursue a claim of prosecutorial vindictiveness. We, however, find no error.

The Due Process clauses of Article I, section 12, of the Indiana Constitution and the Fourteenth Amendment to the United States Constitution prohibit prosecutorial vindictiveness. *Owens v. State*, 822 N.E.2d 1075, 1077 (Ind. Ct. App. 2005). Prosecutorial vindictiveness is a due process concept, allowing a defendant to attempt to establish that the State's charging decision was motivated by a desire to punish a defendant after the defendant did what the law allowed him to do. *United States v. Goodwin*, 457 U.S. 368, 384 (1982).

Here, the State dismissed and re-filed charges prior to trial. There is no presumption of prosecutorial vindictiveness where additional charges are filed prior to trial. *Danks v.*

6

*State*, 733 N.E.2d 474, 483 (Ind. Ct. App. 2000), *trans. denied*. As our Supreme Court has

said:

> [A] prosecutor should remain free before trial to exercise the broad discretion
> entrusted to him to determine the extent of the societal interest in the
> prosecution. An initial decision should not freeze future conduct . . . . [T]he
> initial charges filed by a prosecutor may not reflect the extent to which an
> individual is legitimately subject to prosecution.

*Penley v. State*, 506 N.E.2d 806, 811 (Ind. 1987) (quoting *Goodwin*, 457 U.S. at 382). Once

an information has been dismissed by the State, it may re-file an information against the

defendant, subject to certain conditions. Ind. Code § 35-34-1-13; *Davenport v. State,* 689

N.E.2d 1226, 1229 (Ind. 1997), *clarified on reh'g,* 696 N.E.2d 870 (Ind. 1998). The State

may not re-file if doing so will prejudice the substantial rights of the defendant. *Id.*; *see also*

*Johnson v. State*, 740 N.E.2d 118, 121 (Ind. 2001) (State may not circumvent adverse court

order or prejudice defendant's substantial rights).

Here, Myers argues that "[t]he State's constant addition, subtraction and amendment

of the various charges against [Myers] prejudiced his substantial rights in that [he] had to

keep changing his trial strategy and defense to the charges as they were constantly changed

by the State." *Appellant's Br*. at 15. We disagree. The record before us reflects that in July

2010 the State advised counsel for Myers that the case had been undercharged as a Class C

felony and also informed Myers's counsel about the State's intent to add a charge of

aggravated battery. *Appellant's App*. at 36. The parties attempted plea negotiations, which

ultimately were not successful. The State proceeded to file the Class B felony. The reason

that the State thereafter split that charge into four separate Class B felony counts was in

response to the trial court's directive to be more specific about injuries to Wilson. Thereafter, the trial court ordered the State to condense it back to one Class B felony count, which the State did. The Class B felony aggravated battery charge was filed in July 2010, nine months before trial; consequently, Myers "had adequate time to prepare a defense and was not forced to prepare anew on the eve of trial." *Hollowell v. State*, 773 N.E.2d 326, 331 (Ind. Ct. App. 2002). Furthermore, the Class B felony aggravated battery charge was based on the same facts and circumstances supporting the Class C felony battery charge, namely the fight at the Raceway. Accordingly, Myers was not "forced to discard his prior preparation for trial and begin all over" with different strategies and defenses. *Id*. Myers has not established that his substantial rights were prejudiced when the State dismissed the misdemeanor charge and re-filed it as a Class C felony, nor when it thereafter added a Class B felony aggravated battery count. *See Hollowell*, 773 N.E.2d at 331 (enhanced charges after plea negotiations failed were not product of prosecutorial vindictiveness). The trial court did not err when it denied Myers's request to pursue a claim of prosecutorial vindictiveness.

## II. Amendment to Aggravated Battery Charge

Myers claims that the trial court erred when it allowed the State to amend Count II, the aggravated battery count, on April 4, 2011, two days before trial. He asserts that the amendment "changed the entire theory of the State's case" because it changed the element alleging "serious permanent disfigurement" to a "protracted loss or impairment of a function of a member or bodily organ." *Appellant's Br*. at 16. We disagree with Myers's characterization of the effect of the April 4 amendment, and we find no error.

8

In reaching our decision, we review the procedural history of the Class B felony aggravated battery charge. The State filed the Class B felony aggravated battery charge on July 27, 2010. It alleged that Myers knowingly or intentionally inflicted injury upon Wilson "that caused protracted loss or impairment of the function of a bodily member or organ" contrary to Indiana Code section 35-42-2-1.5(2) ("Subsection 2"). *Appellant's App*. at 10. Then, about two months later, on September 28, 2010, and in response to the trial court's order for more specificity, the State filed an amended charging information that essentially divided the aggravated battery charge into four separate counts, naming a separate injury in each one. However, in addition to separating out the counts, that September amended charging information alleged that Myers knowingly inflicted injury on Wilson that "caused serious permanent disfigurement" contrary to Indiana Code section 35-42-2-1.5(1) ("Subsection 1"). *Id*. at 26. Thus, the element changed from "protracted loss" language of Subsection 2, to "permanent disfigurement" of Subsection 1. However, on March 11, 2011, still almost one month before trial, the State amended the aggravated battery charges yet again, to allege a violation of Subsection 2, i.e., that Myers caused "protracted loss or impairment of the function of a bodily member or organ," which was what the July 2010 original charging information had alleged. A few days later, on March 15, 2011, the State condensed the four separate aggravated battery counts into one, still alleging a violation of Subsection 2, protracted loss or impairment. The April 4 amendment, which Myers now alleges changed the entire theory of the case, only replaced a handwritten numeral "2" with a typewritten numeral "2." *Id*. at 46, 51.

9

In his brief, Myers relies upon Indiana Code section 35-34-1-5(b), which permits amendment to charging information up to thirty days before the omnibus date. However, the April 4 amendment at issue clearly was not an amendment of substance; it was an amendment to form, governed by Indiana Code section 35-34-1-5(c), which states:

> Upon motion of the prosecuting attorney, the court may, at any time before, during, or after the trial, permit an amendment to the indictment or information in respect to any defect, imperfection, or omission in form which does not prejudice the substantial rights of the defendant.

Ind. Code § 35-34-1-5(c).

We acknowledge that the State's circuitous charging pattern of the aggravated battery count – which began under Subsection 2, was amended to Subsection 1, and reverted back to Subsection 2 – was not a model in clarity or procedure. That said, Myers knew the alleged injuries and, other than for a period of less than six months (from September 28, 2010 to March 11, 2011 when the Subsection 1 charges were pending), Myers was charged with causing "protracted loss or impairment." Moreover, as the State observes, Myers's claim of self-defense, which he consistently asserted before and during trial, "was still available to him after the amendment, and his evidence applied equally to the information in either form." *Appellee's Br*. at 12. The trial court did not err by allowing the April 4, 2011 amendment to change a handwritten "2" to a typewritten "2."

### III. Proffered Defense Testimony of Sieg

Myers asserts that the trial court abused its discretion when it disallowed the testimony of proposed defense witness Sieg, who was presented as a skilled or expert witness. Indiana Evidence Rule 702, the evidentiary rule concerning expert testimony, provides:

10

(a) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

A trial court judge has broad discretion to admit or exclude the testimony of an expert witness under Rule 702. *Carter v. State*, 766 N.E.2d 377, 380 (Ind. 2002). The trial court's decision will only be reversed for an abuse of that discretion. *Id.*

At trial, Myers desired to have Sieg, who is trained in martial arts and teaches self-defense classes, testify about what would have constituted a reasonable response to the situation that Myers faced on the night in question. Myers's counsel argued that Sieg's testimony would be helpful to the jury because Sieg would explain to the jury that when a person is faced with multiple attackers,[5] it is reasonable for that person to "take out the leader of the group." *Tr.* at 306-07; *see also id.* at 324. The State opposed Sieg's testimony, arguing that Myers was not trained in martial arts, had not taken self-defense classes and, consequently, Sieg's testimony about how a person with martial arts training might react to the situation was not relevant or applicable to Myers. Ultimately, the trial court determined that Sieg's testimony would not assist the jury and was inadmissible, but permitted Myers to make an offer of proof for the record by having Sieg testify out of the jury's presence. At the conclusion, the trial court affirmed its prior decision, finding that Sieg's testimony was

---

[5] Myers testified that he felt confronted with multiple attackers because as Wilson approached him and reached out at him, Wilson's teenaged son and friend were following some yards behind. However, Myers conceded that the two young men did not speak or shout to him at any time or in any way physically become involved. As Myers walked away, they helped Wilson to his feet and assisted him to his racing trailer.

11

inadmissible under Rule 702 because it was not likely to assist the trier of fact and was further inadmissible under Rule 704 because it related to Myers's intent.[6]  *Id*. at 340.

On appeal, Myers contends that, by precluding Sieg from testifying, the trial court effectively impeded his opportunity to present his defense, which was that he acted in self-defense, and more specifically, that his response to Wilson was a "natural reaction" and he did not intend to harm him.  *Appellant's Br*. at 20.  We are not persuaded, however, that any error occurred with regard to the exclusion of Sieg's testimony.  First, as the State observes, Sieg had no specialized training in "perception or decision-making that would qualify him to testify about the reasonableness of [] responding to a threat."  *Appellee's Br*. at 14.  Second, Sieg was a skilled martial arts expert, but Myers had never trained in martial arts or attended any self-defense class taught by Sieg or anyone else, so Sieg's perceptions or opinions about what was a reasonable response had little, if any, bearing on Myers's situation.  Third, Sieg's opinions about what constituted a reasonable reaction to the situation were based upon the premise that Myers was confronted by multiple attackers, the accuracy of which is debatable since Wilson acted alone when he confronted and engaged Myers that night.  Wilson's son, N.W., observed his father walk past, and he followed him to see where he was going; however, no one testified that N.W. or his friend became involved either verbally or physically in the altercation between Myers and Wilson or in any way threatened Myers.  In fact, the evidence most favorable to the judgment is that the boys were sixty to seventy feet

---

[6] Rule 704(b) provides that "[w]itnesses may not testify to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions."

away when Myers threw Wilson to the ground and kicked him. Under the facts of this case, the trial court did not err in determining that Sieg's testimony would not have assisted the trier of fact and thereby failed to satisfy the standards of Rule 702 for admissibility. *See F.A.C.E. Trading, Inc. v. Carter*, 821 N.E.2d 38, 44 (Ind. Ct. App. 2005) (no error where trial court struck expert affidavits because opinions would not have assisted trier of fact), *trans. denied*. Moreover, the exclusion of Sieg's testimony did not prejudice Myers's ability to present his claim of self-defense; at trial, Myer cross-examined all the State's witnesses, he presented the testimony of several individuals who witnessed the incident, and he testified in his own behalf giving his version of events and stating that he did not intend to harm Wilson.

Finally, we also agree with the trial court that Sieg's proffered testimony concerning the reasonableness of Myers's response – which according to Sieg was a tactical decision when faced with multiple attackers to take out the leader in order to diffuse the situation – effectively was testimony as to Myers's intent, and inadmissible under Evidence Rule 704(b). The trial court did not abuse its discretion when it excluded Sieg's proffered testimony.

### IV. Self-Defense

Myers claims the evidence was not sufficient to negate his claim of self-defense. *Appellant's Br.* at 1. A valid claim of self-defense provides a legal justification for a person to use force against another to protect himself from what he reasonably believes to be the imminent use of unlawful force. Ind. Code § 35-41-3-2(a); *Wilson v. State*, 770 N.E.2d 799, 800 (Ind. 2002); *Carroll v. State*, 744 N.E.2d 432, 433 (Ind. 2001). If a defendant is convicted despite his claim of self-defense, we will reverse only if no reasonable person

13

could say that self-defense was negated by the State beyond a reasonable doubt. *Wilson*, 770 N.E.2d at 800-01. The standard of review for a challenge to the sufficiency of evidence to rebut a claim of self-defense is the same as the standard for any sufficiency of the evidence claim. *Wilson*, 770 N.E.2d at 801 (citing *Sanders v. State,* 704 N.E.2d 119, 123 (Ind. 1999)). We neither reweigh the evidence nor judge the credibility of witnesses. *Id.* If there is sufficient evidence of probative value to support the conclusion of the trier of fact, then the verdict will not be disturbed. *Id.*

In order to prevail on a self-defense claim, the defendant must show that he: (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm. *Id.* at 800. Furthermore, a mutual combatant, whether or not he is the initial aggressor, must declare an armistice before he or she may claim self-defense. *Id.* at 801 (citing Ind. Code § 35-41-3-2(e)(3)). Once a defendant claims self-defense, the State must disprove, beyond a reasonable doubt, at least one element of self-defense. *Carroll*, 744 N.E.2d at 433. The State may meet its burden by either rebutting the defense or relying on the sufficiency of evidence in its case-in-chief. *Id.* at 434.

In challenging the sufficiency of the evidence that was presented to rebut his claim of self-defense, Myers primarily relies on the fact that Wilson provoked the confrontation and was the initial aggressor. It is not disputed that Wilson left his seat in the stands after the race with an intention to find Myers and confront him about his driving, which ultimately resulted in Wilson's son being eliminated from the race. When Wilson located Myers in a

14

common area, Wilson was angry, yelling, and swearing. Wilson approached Myers, and either pushed him or attempted to push him. There was some testimony that, initially, Myers began to walk away, i.e. withdraw from the encounter. Under these circumstances, there can be little dispute that Myers was in a place he had a right to be and that Myers did not provoke or instigate the violence. However, it is subsequent events that are most relevant to our analysis.

At the point when Myers turned to walk away, Wilson reached for Myers, who turned around, grabbed Wilson's arm, and forcefully either threw Wilson to the ground or "cold cocked" him with a punch. *Tr*. at 133. Wilson was on the ground "kind of in a daze," on his hands and knees, patting the ground looking for his glasses. *Id*. One observer testified that, at that point, he thought the fight "was over." *Id*. at 166, 176. However, while Wilson was still on his hands and knees, Myers, who was wearing his racing boots, kicked Wilson in the head, on the side of the face, with such force that Wilson flipped over backward, which one witness likened to a punter kicking a football. *Id*. at 134. Myers then walked away. Under these circumstances, the State disproved the self-defense element that Myers did not willingly participate in the violence. On this basis alone, the State rebutted Myers's self-defense claim.

As to whether Myers had a reasonable fear of death or great bodily harm, Myers testified that, when he saw Wilson approaching, cussing and yelling, with N.W. and his friend some yards behind, Myers anticipated that "I was about to get the tar beat out of me." *Id*. at 247. Even assuming that Myers had a reasonable fear of death or great bodily injury as

15

Wilson was approaching him, Myers could not have been in fear of death or great bodily harm at the point in time when Wilson was on the ground on his hands and knees in a dazed state looking for his glasses. Rather, the reasonable inference is that Myers was angry at Wilson for the initial confrontation and was retaliating.[7] *See Wilson*, 770 N.E.2d at 801 (although Wilson was not initial aggressor, evidence showed Wilson continued shooting after other party ceased shooting and was leaving area in car). The State presented sufficient evidence to rebut Myers's claim of self-defense.

Affirmed.

BARNES, J., and BRADFORD, J., concur.

---

[7] Myers conceded at trial to being aware of a high probability that serious injury could result if a person was kicked in the head. *Tr.* at 281.

16